[DO NOT PUBLISH]

# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 23-10250

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

PAULA L. HORNBERGER,
GEORGE R. CAVALLO,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:10-cr-00550-VMC-TGW-9

_____

Before JORDAN, ROSENBAUM, and LAGOA, Circuit Judges.

PER CURIAM:

George Cavallo and Paula Hornberger were convicted of participating in a mortgage-fraud scheme involving the use of falsified information on loan applications. At sentencing, the district court originally ordered Cavallo and Hornberger to pay more than $13 million in restitution, stemming from ten properties, to multiple banks under the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A. In a prior appeal, we affirmed their convictions and sentences, but we vacated the restitution orders and remanded for the district court to determine the actual loss of any identifiable victims. *United States v. Cavallo*, 790 F.3d 1202, 1240 (11th Cir. 2015). On remand, after considerable delay, the district court entered amended judgments awarding $7,321,913.80 in restitution to multiple banks or their successors in interest. Cavallo and Hornberger again appeal the orders of restitution.

The government concedes that it failed to properly establish nearly all of the $7.3 million loss amount, but it asks us to affirm a lesser restitution amount based on one of the ten properties at issue. Cavallo and Hornberger contend that no restitution should have been awarded because the government waited too long and failed to meet its burden of proof for successor lender victims under *United States v. Martin*, 803 F.3d 581 (11th Cir. 2015).

After careful review, we agree with the parties that the government failed to prove any losses to successor lenders, which covers nine of the ten properties for which restitution was awarded. We therefore reverse the restitution award as to those nine properties.  But because no successor lender was involved in the tenth and final property, the government's proof was sufficient to sustain those losses.  So we affirm the district court's finding of a loss of $332,530 in relation to that property.  We reject the argument that, given the delay, the district court should not have imposed restitution.

## I.

Cavallo and Hornberger joined multiple other defendants in a decade-long mortgage-fraud scheme involving the use of falsified information on loan applications to purchase residential properties. After a jury trial in 2012, Cavallo and Hornberger were convicted of conspiracy to commit wire fraud and to make false statements to financial institutions insured by the Federal Deposit Insurance Corporation ("FDIC"), *see* 18 U.S.C. § 371, as well as a substantive count of making false statements to an FDIC-insured bank, *see id.* § 1014.  The district court sentenced Cavallo to 120 months' imprisonment and Hornberger to twelve months and one day.  The court also ordered Cavallo and Hornberger to pay about $13 million in restitution to five named banks.

Although we affirmed Cavallo's and Hornberger's convictions and sentences on appeal, we vacated and remanded the restitution orders issued as to them.  *Cavallo*, 790 F.3d at 1210, 1240.

We explained that restitution must reflect actual loss to the victim and may not amount to a windfall. *Id.* at 1239. And we found that the district court created a windfall because its "restitution computation did not reflect any credits against loss for the proceeds of properties that had been sold or for the current fair market value of properties not yet sold." *Id.* at 1238–39. We noted that the court's actual loss figure for the sentencing guidelines, $7,454,210.74, included such credits, and that "the restitution figure should usually be the same as the [actual] loss amount." *Id.* at 1239.

Because "the restitution amount ordered by the district court [did] not take into account the value of the collateral properties to the victims," and so did "not represent the actual loss to the victims," we vacated the restitution orders and remanded for the district court "to enter a restitution amount that reflects the actual loss to the victims." *Id.* at 1240. We also left to the court "the task of sorting out the identities of the victims to be made whole." *Id.* at 1240 n.31. Our mandate issued in July 2015.

After considerable delay, the government filed a motion to schedule a restitution hearing in March 2021. It appears that, in the interim, the original prosecution team had ceased working on the case, and the parties had been unable to reach an agreement on the restitution amount. Cavallo and Hornberger objected to the government's request on jurisdictional and due-process grounds, citing the post-remand delay.

At a status hearing in May 2021, the district court determined that the delay on remand, though "regrettable," did not

amount to a due process violation or prevent the court from ordering restitution. The court reasoned that no due-process violation occurred because some of the delay stemmed from negotiations, the defendants had not asked the court to resolve the issue, and the defendants suffered no prejudice from the delay.

Then, at a restitution hearing in August 2021, the government presented the testimony of Paul Serletti, a contract financial investigator working for the U.S. Attorney's Office. Serletti explained that he had reviewed loan, appraisal, and foreclosure records for the ten properties that were the basis for the restitution amount originally imposed by the district court. All but one of the properties was sold in foreclosure, which netted about $4.8 million for the entities that held the mortgages at the time of the sales. Serletti also considered property values at the time of sentencing in 2012 and compared those to the outstanding mortgage loan balances. Using the property value figures, which were more favorable to the defendants, Serletti calculated a restitution amount of $7,321,913.80, as reflected in the government's Exhibit 6.

Serletti acknowledged that mortgages were bought and sold in the secondary mortgage market. But in his analysis, he did not consider whether the original holder of the mortgages at issue sold those mortgages on the secondary market or, if so, for how much.

In post-hearing briefs, the government conceded that it lacked information about the purchase price the successor lenders paid for the mortgages, but it maintained that the district court could still make a "reasonable estimate." The government noted

that it was still attempting to obtain such purchase price information. Cavallo and Hornberger argued that the government's evidence was insufficient to identify either the actual loss or the victims, as *Martin* requires.

The district court held a final restitution hearing in December 2022. The court determined that Serletti's final figure of $7,321,913.80, as reflected in Exhibit 6, was "the most reasonable estimate of loss in this case," and that the government had "sufficiently identified the lenders and successor lenders who are the proper victims under the MVRA [Mandatory Victim Restitution Act]." The court noted that the government's evidence identified the successor lenders who held the mortgages at the time of the foreclosure sales. Despite prevailing, the government proposed, and then withdrew, an offer to agree to a lower restitution amount.

In January 2023, the district court entered amended judgments reflecting restitution awards to the original named payees or their successors in interests. The court imposed restitution jointly and severally with other members of the conspiracy. As relevant here, the court ordered $1,055,530.00 in restitution to the Federal Deposit Insurance Corporation, as the receiver for Washington Mutual Bank, F.A ("WaMu"), based on mortgages at four of the ten properties. Cavallo and Hornberger appeal.

**II.**

We first consider Cavallo's and Hornberger's arguments that the district court should not have awarded restitution at all because of the unreasonable delay on remand, which allegedly

23-10250                Opinion of the Court                7

violated their due-process and speedy-trial rights under the Fifth and Sixth Amendments.[1]  We review de novo constitutional challenges to a sentence.  *United States v. Pope*, 461 F.3d 1331, 1332 (11th Cir. 2006).

For starters, the defendants have not established a violation of their constitutional right to a speedy trial.  The Supreme Court has held that "[t]he Sixth Amendment speedy trial right . . . does not extend beyond conviction."  *Betterman v. Montanai*, 578 U.S. 437, 448 (2016).  Because the delay in this case occurred after the convictions had been affirmed on appeal, when the speedy trial right did not apply, the defendants cannot establish a violation of that right.

That leaves due process and the defendants' right to "a sentencing proceeding that is fundamentally fair."  *Id.*  In *Dolan v. United States*, 560 U.S. 605, 616–17 (2010), the Supreme Court indicated that due process may protect against unreasonable delays in ordering restitution.  Factors relevant to that inquiry include the length of the delay, the reasons for the delay, the defendant's diligence in requesting expeditious sentencing, and prejudice to the defendant.  *Id.*; *Betterman*, 578 U.S. at 448 n.12; *see also United States v. Rodriguez*, 751 F.3d 1244, 1260–61 (11th Cir. 2014).

---

[1] Hornberger has dropped her challenge to the district court's jurisdiction to order restitution.  *See, e.g.*, *Dolan v. United States*, 560 U.S. 605, 611 (2010) (concluding that delay in ordering restitution does not deprive the court of jurisdiction).

Here, the district court properly concluded that the post-remand delay in ordering restitution did not violate the defendants' due-process rights. The court reasoned that, although the delay was substantial, no due-process violation occurred because some of the delay was attributable to discussions between the parties, the defendants never asked the court to resolve the issue, and the defendants suffered no prejudice from the delay.

In response, Hornberger claims that some of the government's asserted reasons for the delay are weak. We agree, but the district court did not rely on those reasons or find that the delay was fully excused. Rather, it found that the delay was attributable in part to discussions between the parties, which the record bears out, and we see no evidence of bad faith. Hornberger also contends that she diligently pressed the government for details about their restitution obligations. But even so, she never undertook the "minimal burden" of "pointing to the [restitution] statute and asking the court to grant a timely hearing." *Dolan*, 560 U.S. at 616–17; *see* 18 U.S.C. § 3664(d)(5). Had she done so, much of the delay could have been avoided.

More importantly, the defendants have not shown they were prejudiced by the delay. *See Rodriguez*, 751 F.3d at 1261 (noting that "not every delay . . . , even an inordinate one, violates due process") (quotation marks omitted). Hornberger argues that she suffered prejudiced by having to pay monthly restitution post-remand, and by living with the uncertainty of restitution even after being terminated from supervised release. Despite the drawn-out

proceedings, though, she knew that a substantial restitution award was likely given our remand to determine restitution and our affirmance of the district court's loss calculations. What's more, the defendants make no claim that the delay "depriv[ed] [them] of evidence to rebut the claimed restitution amount."[2] *Dolan*, 560 U.S. at 617. Indeed, the deficiencies in the government's proof as to successor lenders under *Martin* were apparent.

For these reasons, the district court did not err in declining to order restitution for due-process or other equitable reasons.

## III.

"We review *de novo* questions of law concerning a restitution order, and we review for clear error the factual findings supporting a restitution order." *United States v. Goldman*, 953 F.3d 1213, 1223 (11th Cir. 2020).

The Mandatory Victims Restitution Act, *see* 18 U.S.C. § 3663A, "requires the district court to calculate actual loss 'to identifiable victims of certain crimes, including crimes of fraud.'" *United States v. Stein*, 846 F.3d 1135, 1153 (11th Cir. 2017) (quoting *Martin*, 803 F.3d at 592). Restitution seeks to make victims of crimes whole by compensating them for their losses. *Goldman*, 953 F.3d at 1223. But it "should not provide a windful for crime victims." *Id.* (quotation marks omitted). So "a restitution award must be based on the amount of loss actually caused by the defendant's

---

[2] In particular, the defendants raise no specific proof issues as to the only property for which we have affirmed the restitution award.

conduct," *id.* (cleaned up), or at least a "reasonable estimate" of that amount, *United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019).  The government bears the burden of proving the loss amount by a preponderance of the evidence.  *Goldman*, 953 F.3d at 1223.

Ordinarily, when a lender is harmed by mortgage fraud, the loss amount must be reduced by either the amount recovered by the lender through sale of the collateral, or, if no sale occurred, the fair market value of the collateral at sentencing.  *Cavallo*, 790 F.3d at 1239; *see* U.S.S.G. § 2B1.1 cmt. n.3(E)(ii).  The government's evidence at the restitution hearing broadly fit these parameters.

Nevertheless, as we recognized in *Martin*, mortgages can be bought by successor lenders in the secondary market.  And in situations where a successor lender is injured by a defendant's mortgage fraud, the lender's restitution award "turn[s] on how much it paid to acquire the mortgage."  *Martin*, 803 F.3d at 595.  Any losses recouped by the victim are then deducted from the amount the "lender paid to acquire the mortgage," rather than the original loan balance.  *Id.* at 595–96.  This modified formula, like the ordinary formula, seeks to "place the lenders in the position they would be in if the defendant never committed the fraud and, accordingly, the loan had never been made."  *Id.* at 596.

Thus, a restitution award to a successor lender requires "evidence on the loan's actual purchase price" or a "reasonable estimate" thereof.  *Id.*  Although modern banking realities may make it difficult to determine the details of a such a sale, "the district

23-10250                Opinion of the Court                11

court cannot simply presume that the successor lenders paid the outstanding principal balance to acquire the mortgages." *Id.* In *Martin*, for example, we vacated a restitution award where there was no "evidence regarding the actual price the successor lenders paid for the mortgages" or other evidence sufficient to establish a reasonable estimate of that cost. *See id.*

Here, the district court clearly erred in imposing restitution as to those mortgages that had been sold to successor lenders. As to those mortgages, covering nine of the ten properties for which restitution was awarded, the government concedes it did not meet its burden under *Martin* to establish the "actual price the successor lenders paid for the mortgages," or a reasonable estimate thereof. *See id.* We agree. Because we "cannot simply presume that the successor lenders paid the outstanding principal balance to acquire the mortgages," and there is no evidence of the purchase price in the record, the court's calculations are insufficient to sustain the restitution award as to any successor lenders. *Id.*

On the other hand, we affirm the restitution award for losses related to the property at 635 Waterside Way, which does not involve a successor lender. The government presented evidence that Waterside was collateral for a $998,000 mortgage loan that WaMu originated. In December 2007, WaMu foreclosed the mortgage, when $997,930 in principal remained, and then sold the property for $550,448.88 in September 2008. Later in September 2008, the FDIC was appointed receiver for WaMu. *See Vernon v. FDIC*, 981 F.2d 1230, 1234 (11th Cir. 1993) (stating that the FDIC, as receiver,

"steps into the shoes of the failed institution and takes possession of both the assets and the liabilities"). The market value of the property as of 2012, the year of sentencing, was $665,400.

Because the foreclosing party was the original lender, the ordinary loss calculation formula applies, and the government's evidence was sufficient. The government's expert, in calculating loss, properly took the outstanding mortgage balance at foreclosure ($997,300), and then reduced it by either the amount recovered by the lender through sale of the collateral ($550,448.88) or the fair market value of the collateral at sentencing ($665,400). *See Cavallo*, 790 F.3d at 1239; U.S.S.G. § 2B1.1 cmt. n.3(E)(ii). The foreclosure-sale amount results in a loss of $447.481.12, while the market-value figure yields a loss of $332,530.

The government now says we should affirm using the foreclosure-sale amount. But in the district court, the government adopted the calculations of its expert, who testified that, out of fairness to the defendants, he used the more favorable fair-market-value figures in his final loss calculations, as reflected in Exhibit 6. And the district court expressly adopted the calculations in Exhibit 6 when ordering restitution, declaring them the "most reasonable estimate of the loss in this case."

So we reject the government's attempt to rely on the foreclosure-sale amounts, as well as Hornberger's claim that the court did not make a restitution finding as to Waterside that could be affirmed. We note further that the district court's choice to use 2012 property values, instead of the 2008 foreclosure-sale amount,

avoids Hornberger's concern about inflation of the loss as a result of the collapse of the housing market more broadly.[3]

For these reasons, we affirm the district court's finding that the FDIC, as receiver for WaMu, incurred a loss of $332,530 from the mortgage-fraud conspiracy in relation to the Waterside property.  *See Goldman*, 953 F.3d at 1223.  We reverse the restitution order as to the nine other properties for which restitution was awarded.[4]

**AFFIRMED in part; REVERSED in part.**

---

[3] Hornberger is not in a strong position to complain in this regard, given evidence that the mortgage-fraud conspiracy in which she participated involved practices designed to inflate housing prices.  That conduct included "fraudulently obtain[ing] the maximum amount of possible loans for each property" and "falsely inflat[ing] the sale price of properties in the loan documents they submitted to lenders."  *United States v. Cavallo*, 790 F.3d 1202, 1210–11 (11th Cir. 2015).

[4] Cavallo also broadly disputes that he was the proximate cause of any losses.  But the district court properly declined to consider the matter on remand.  The scope of our mandate included determining the amount of the loss suffered by identifiable victims for the ten properties on which the restitution order was based, not the issue of proximate cause.  *See Cavallo*, 790 F.3d at 1240 & n.31.  Indeed, we otherwise rejected Cavallo's similar arguments challenging the district court's calculation of a loss amount of $7,454,210.74 under the guidelines for the same ten properties, *id*. at 1232–34, and we observed that "[p]roving actual loss for restitution purposes is largely the same as proving actual loss for Guidelines' loss calculation purposes," *Id*. at 1239.