[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-10829

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

ANDRE MICHAEL DUBOIS,
a.k.a. Larry Davis,
a.k.a. Andre Dubois,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:20-cr-00305-WMR-JKL-1

_____

**ON REMAND FROM THE SUPREME COURT OF THE
UNITED STATES**

Before WILLIAM PRYOR, Chief Judge, and ROSENBAUM and ABUDU, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal on remand from the Supreme Court requires us to decide whether *United States v. Rahimi*, 144 S. Ct. 1889 (2024), abrogated our decision in *United States v. Rozier*, 598 F.3d 768, 770–71 (11th Cir. 2010), upholding the federal law that bars felons from possessing firearms and ammunition, *see* 18 U.S.C. § 922(g)(1). Following supplemental briefing, we conclude that *Rahimi*—like *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022)—did not abrogate our holding in *Rozier* that section 922(g)(1) is constitutional under the Second Amendment. We reinstate our previous opinion and affirm Andre Dubois's convictions and sentence.

**I. BACKGROUND**

In 2018, Andre Dubois entered an Express Copy Print & Ship store in Suwanee, Georgia, and attempted to ship a box containing firearms to the Commonwealth of Dominica. Federal officials seized the shipment and charged Dubois with three counts: attempting to smuggle firearms out of the United States, *see* 18 U.S.C. § 554; delivering firearms to a common carrier for shipment

without written notice, *see id.* § 922(e); and possessing a firearm as a felon, *see id.* § 922(g)(1).

At trial, the parties stipulated that Dubois "was a convicted felon at the time of the offense charged in this case" and that he "had knowledge of this felony conviction." The prosecution then presented evidence that Dubois had attempted to ship a loaded revolver, two disassembled pistols, and over 400 bullets to Dominica under a false name. Federal officials seized the package after a carrier employee identified a suspicious object during an x-ray screen. The firearms and ammunition were wrapped in aluminum foil and hidden in two individually packaged deep fryers. Using the shipping store's surveillance footage, agents identified Dubois as the shipper by tracing the logo on the shipper's sweatshirt to Dubois's former employer.

At the close of the prosecution's case, Dubois moved for acquittal on all counts. *See* FED. R. CRIM. P. 29(a). He argued that the prosecution failed to introduce sufficient evidence that Dubois knew that the package that he attempted to ship contained firearms. And he argued that his section 922(g)(1) charge was unconstitutional because nonviolent felons maintain a Second Amendment right to possess firearms—although he acknowledged that "existing precedent" foreclosed this argument. The district court denied Dubois's motion, and the jury convicted him on all counts.

A probation officer prepared a presentence investigation report recommending an imprisonment range of 130 to 162 months and a fine range of $25,000 to $250,000 under the Sentencing

Guidelines. This report detailed that Dubois had previously been convicted of multiple felonies, including possession of marijuana with intent to distribute, sale of marijuana, possession of the psychedelic 5-MeO-DIPT, possession of THC oil, possession of movies for the purpose of unlawful distribution, and financial identity fraud. And it documented that Dubois had committed his latest round of crimes while on probation. Dubois did not dispute any of these factual findings from the report. The district court overruled Dubois's other objections and sentenced him to a below-guideline prison sentence of 110 months and a low-end fine of $25,000.

Dubois appealed his convictions and sentence. While his appeal was pending, but before the parties filed their briefs, the Supreme Court decided in *Bruen* that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." 142 S. Ct. at 2122. Dubois later moved to stay his appeal pending the Supreme Court's decision in *Rahimi*. We denied his motion to stay and his motion for reconsideration.

On appeal, we held that Dubois's challenge under the Second Amendment failed because *Bruen* did not abrogate our decision in *Rozier*, which upheld the felon-in-possession ban. *United States v. Dubois*, 94 F.4th 1284, 1291–93 (11th Cir. 2024). And we rejected the other challenges that Dubois raised to his convictions and sentence. *Id.* at 1293–1303. We ruled that sufficient evidence supported the jury's finding that Dubois knew that he possessed a firearm, Dubois's state marijuana conviction was a "controlled

substance offense" under the Sentencing Guidelines, application of the stolen-gun enhancement on a strict-liability basis did not violate due process, and Dubois's fine was not plainly erroneous. *Id.*

Dubois filed a petition for a writ of certiorari in the Supreme Court. The Court granted the petition, vacated the judgment, and remanded the case back to us "for further consideration in light of . . . *Rahimi*." *Dubois v. United States*, 145 S. Ct. 1041, 1042 (2025). On remand, we granted Dubois's motion for supplemental briefing. We directed the parties to brief two issues: (1) "Did [*Rahimi*] abrogate our prior precedent upholding section 922(g)(1)?" and (2) "If *Rahimi* abrogated our prior precedent, does section 922(g)(1) violate the Second Amendment as applied to Appellant?" Dubois did not ask us to revisit any of the other issues that we decided in our earlier opinion.

## II. STANDARD OF REVIEW

We review challenges to the constitutionality of a statute *de novo*. *United States v. Fleury*, 20 F.4th 1353, 1362 (11th Cir. 2021).

## III. DISCUSSION

This appeal on remand from the Supreme Court turns on whether *Rahimi* abrogated our prior decision in *Rozier* upholding the felon-in-possession ban. Dubois initially raised other challenges to his convictions and sentence unrelated to the Second Amendment. Yet "[o]n remand these issues were not re-briefed, and nothing in [*Rahimi*] alters our consideration of those issues." *United States v. Ruan*, 56 F.4th 1291, 1295 n.1 (11th Cir. 2023). So this opinion reinstates our prior opinion as to those issues and updates only

the discussion in Part III.A of our earlier opinion about the constitutionality of section 922(g)(1) to take account of *Rahimi*. *Dubois*, 94 F.4th at 1291–93.

Dubois challenges the denial of his motion for a judgment of acquittal on the felon-in-possession charge. *See* 18 U.S.C. § 922(g)(1). Dubois does not dispute that his conduct falls squarely within the federal offense: he possessed firearms and ammunition after sustaining a felony conviction for drug trafficking. He instead argues that the statute violates his right to bear arms under the Second Amendment. Dubois concedes that our precedent bars his challenge; we upheld section 922(g)(1) under the Second Amendment in *Rozier*, 598 F.3d at 770–71. But Dubois argues that *Rahimi* abrogated *Rozier* and requires us to vacate his conviction. We disagree.

In *District of Columbia v. Heller*, the Supreme Court sustained a Second Amendment challenge to a District of Columbia law that prohibited private possession of handguns. 554 U.S. 570, 635 (2008). The Court adopted an approach "bas[ed] o[n] both text and history" for analyzing gun restrictions and ruled the prohibition unconstitutional. *Id.* at 595. It held that law-abiding citizens have a Second Amendment right to possess handguns in the home for self-defense. *Id.* at 635–36.

*Heller* cautioned that the Second Amendment right "is not unlimited." *Id.* at 626. Importantly, the Court stated that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally

ill." *Id.* The Court labeled these regulations "presumptively lawful." *Id.* at 627 n.26. And it explained that the Second Amendment guarantees a right to "law-abiding, responsible citizens" to "use arms in defense of hearth and home." *See id.* at 635.

Nearly two years after *Heller*, we rejected a challenge to section 922(g)(1) in *Rozier*. Like Dubois, Rozier possessed a firearm and ammunition after he was convicted of several felony drug crimes. *Rozier*, 598 F.3d at 769 & n.1. He challenged his conviction on the ground that section 922(g)(1) violates the Second Amendment. *Id.* at 770. We disagreed because, under *Heller*, "statutes disqualifying felons from possessing a firearm under any and all circumstances do not offend the Second Amendment." *Id.* at 771. "[T]he first question" under *Heller*, we explained, "is whether one is *qualified* to possess a firearm." *Id.* at 770. And felons are unqualified as "a class" because they are not "law-abiding citizen[s]." *Id.* at 771. *Heller* "made this clear" by labeling the felon-in-possession ban "'a presumptively lawful longstanding prohibition.'" *Id.* (quoting *United States v. White*, 593 F.3d 1199, 1205–06 (11th Cir. 2010)); *accord McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill' . . . . We repeat those assurances here." (quoting *Heller*, 554 U.S. at 626)). And we said that this language from *Heller* was "not dicta" because it limited the Second Amendment right to "*law-abiding* and *qualified* individuals." *Rozier*, 598 F.3d at 771 n.6.

After *Heller* and *Rozier* came *Bruen*, which involved a challenge to New York's gun-licensing regime. 142 S. Ct. at 2122. New York prohibited law-abiding citizens from obtaining a license to carry outside the home unless they first proved "a special need for self-defense." *Id.* The Court ruled the scheme unconstitutional because "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Id.*

*Bruen* began its analysis by rejecting, as inconsistent with *Heller*, the second part of a two-step test that then prevailed in most circuits. *See id.* at 2125–30. Under that test, a court would first ask whether the challenged law burdened conduct that falls within the scope of the Second Amendment, "as historically understood." *E.g.*, *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012). If it did, the court would review the regulation under either intermediate or strict scrutiny. *See id.* We embraced this two-part framework in dicta beginning in 2012, *see GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012), but we have never actually applied the second, means-end-scrutiny step, *see United States v. Jimenez-Shilon*, 34 F.4th 1042, 1052–53 (11th Cir. 2022) (Newsom, J., concurring).

*Bruen* approved "[s]tep one of the predominant framework" as "broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." 142 S. Ct. at 2127. But *Bruen* rejected the second, "means-end scrutiny" step as incompatible with *Heller*, which "expressly rejected" applying a

"judge-empowering interest-balancing inquiry" to analyze Second Amendment challenges. *Id.* at 2127, 2129 (internal quotation marks omitted) (quoting *Heller*, 554 U.S. at 634). *Bruen* then reiterated that "*Heller*'s text-and-history standard" is the correct test for determining the constitutionality of gun restrictions. *See id.* at 2138.

The Supreme Court left no doubt that it viewed its decision as a faithful application of *Heller*, not a departure from it. *See, e.g.*, *id.* at 2122 (stating that its holding is "consistent with *Heller*"); *id.* at 2131 (stating that "[t]he test that [the Court] set forth in *Heller*" is the same one that courts must "apply today"); *id.* (stating that its test "[f]ollow[s] the course charted by *Heller*"). That approval of *Heller* included the recognition that the Second Amendment is "subject to certain reasonable, well-defined restrictions." *Id.* at 2156 (citing *Heller*, 554 U.S. at 581). Although the Court did not mention felon-in-possession bans, it confirmed that *Heller* correctly "relied on the historical understanding of the Amendment to demark the limits on the exercise of that right." *Id.* at 2128. And *Bruen*, like *Heller*, repeatedly described the right as extending only to "law-abiding, responsible citizens." *See, e.g.*, *id.* at 2131 (internal quotation marks omitted) (quoting *Heller*, 554 U.S. at 635).

Finally, after *Bruen* came *Rahimi*, which considered a challenge to the federal law prohibiting individuals subject to domestic violence restraining orders from possessing firearms. 144 S. Ct. at 1894; *see also* 18 U.S.C. § 922(g)(8). In applying the *Bruen* history-and-tradition test, the Supreme Court warned that "some courts have misunderstood the methodology of our recent Second

Amendment cases," which "were not meant to suggest a law trapped in amber." *Rahimi*, 144 S. Ct. at 1897. *Rahimi* reiterated that a historical analogue "need not be a 'dead ringer' or a 'historical twin'" to establish that a modern regulation "comport[s] with the principles underlying the Second Amendment." *Id.* at 1898 (alteration adopted) (quoting *Bruen*, 142 S. Ct. at 2133). And after analogizing to surety and going armed laws from the Founding era, the Court "ha[d] no trouble concluding that [s]ection 922(g)(8) survive[d] Rahimi's facial challenge." *Id.* at 1899–1902.

    *Rahimi* continued to rely on *Heller*. The Supreme Court reiterated that "the right secured by the Second Amendment is not unlimited." *Id.* at 1897 (internal quotation marks omitted) (quoting *Heller*, 554 U.S. at 626). The Court made clear that it was "not suggest[ing] that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." *Id.* at 1901 (citing *Heller*, 554 U.S. at 626). And it once again endorsed *Heller*'s understanding that prohibitions "on the possession of firearms by 'felons and the mentally ill . . .' are 'presumptively lawful.'" *Id.* at 1902 (quoting *Heller*, 554 U.S. at 626, 627 n.26).

    To determine whether *Rahimi* abrogated *Rozier*, we apply our prior-panel-precedent rule: "'a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*.'" *In re Lambrix*, 776 F.3d 789, 794 (11th Cir. 2015) (quoting *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir.

2008)). An intervening Supreme Court decision abrogates our precedent only if the intervening decision is both "clearly on point" and "clearly contrary to" our earlier decision. *Edwards v. U.S. Att'y Gen.*, 97 F.4th 725, 743 (11th Cir. 2024) (emphasis omitted) (citation and internal quotation marks omitted). If the Supreme Court "never discussed" our precedent and did not "otherwise comment[] on" the precise issue before the prior panel, our precedent remains binding. *See United States v. Vega-Castillo*, 540 F.3d 1235, 1238–39 (11th Cir. 2008). To abrogate a prior-panel precedent, "the later Supreme Court decision must 'demolish' and 'eviscerate' each of its 'fundamental props.'" *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1223 (11th Cir. 2022) (alterations adopted) (citation omitted). So, for example, if our precedent relied on "a line of Supreme Court precedents that the [Supreme] Court itself emphasizes in a later decision is not implicated by that later decision," the Supreme Court's intervening decision "cannot have" abrogated our precedent. *Id.*

As we decided in our earlier opinion, *Bruen* did not abrogate *Rozier*. Because the Supreme Court "made it clear in *Heller* that [its] holding did not cast doubt" on felon-in-possession prohibitions, *McDonald*, 561 U.S. at 786 (plurality opinion), and because the Court made it clear in *Bruen* that its holding was "[i]n keeping with *Heller*," 142 S. Ct. at 2126, *Bruen* could not have clearly abrogated our precedent upholding section 922(g)(1), *see Del Castillo*, 26 F.4th at 1223–25. Indeed, the *Bruen* majority did not mention felons or section 922(g)(1). *See Vega-Castillo*, 540 F.3d at 1238–39.

Dubois argues that we may depart from *Rozier* because *Bruen* abrogated "[a]ll prior precedent relying on the two-step analysis." But *Rozier* upheld section 922(g)(1) on the threshold ground that felons are categorically "disqualified" from exercising their Second Amendment right under *Heller*. *Rozier*, 598 F.3d at 770–71 (citation and internal quotation marks omitted). *Rozier* interpreted *Heller* as limiting the right to "law-abiding and qualified individuals" and as clearly excluding felons from those categories by referring to felon-in-possession bans as presumptively lawful. *Id.* at 771 & n.6 (emphasis omitted). And far from "demolish[ing]" or "eviscerat[ing]" *Rozier*'s reliance on *Heller*, *see Del Castillo*, 26 F.4th at 1224, *Bruen* repeatedly stated that its decision was faithful to *Heller*.

*Rahimi* also did not abrogate *Rozier*. The only time that the *Rahimi* majority mentioned felons was to reiterate *Heller*'s conclusion that prohibitions "on the possession of firearms by 'felons and the mentally ill . . .' are 'presumptively lawful.'" 144 S. Ct. at 1902 (quoting *Heller*, 554 U.S. at 626, 627 n.26). This endorsement of the underlying basis for our prior holding that section 922(g)(1) does not violate the Second Amendment suggests that *Rahimi* reinforced—not undermined—*Rozier*. That the Court also clarified that it was "not suggest[ing] that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse" further confirms that *Rozier* remains good law. *Id.* at 1901 (citing *Heller*, 554 U.S. at 626).

Dubois contends that the Supreme Court nevertheless abrogated *Rozier* when *Rahimi* rejected the argument that someone "may be disarmed simply because he is not 'responsible.'" *Id.* at 1903 (citation omitted). But Dubois misreads *Rozier*. In *Rozier*, we relied on *Heller*'s directive that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons" to conclude that felons are unqualified to possess firearms. *Rozier*, 598 F.3d at 771 (internal quotation marks omitted) (quoting *Heller*, 554 U.S. at 626). Nothing in *Rozier* suggested that "whether one is *qualified* to possess a firearm" turns on whether that person is responsible. *Id.* at 770. Indeed, the word "responsible" does not appear in our opinion. Because *Rozier* did not mention—much less rely on—*Heller*'s reference to whether a citizen is responsible, that now-rejected language could not have been a "fundamental prop[]" of our decision. *Del Castillo*, 26 F.4th at 1223 (citation and internal quotation marks omitted).

We require clearer instruction from the Supreme Court before we may reconsider the constitutionality of section 922(g)(1). *Rozier* continues to bind us, so Dubois's challenge based on the Second Amendment fails.

## IV. CONCLUSION

We reinstate our prior decision and **AFFIRM** Dubois's convictions and sentence.

22-10829          WILLIAM PRYOR, C.J., Concurring          1

WILLIAM PRYOR, Chief Judge, joined by ROSENBAUM, Circuit Judge, concurring:

Although our prior-panel-precedent rule requires us to reject Andre Dubois's constitutional challenge to the federal felon-in-possession ban, *see United States v. Rozier*, 598 F.3d 768, 770–71 (11th Cir. 2010); 18 U.S.C. § 922(g)(1), I write separately to explain that the outcome would likely be the same even if we were deciding this appeal on a clean slate. "Taken together," the Founding-era traditions of punishing felons with death and forfeiture and categorically disarming certain groups deemed to pose a risk of misusing firearms suggest that section 922(g)(1) is "consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 144 S. Ct. 1889, 1898, 1901 (2024).

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2129–30 (2022). "The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. When evaluating "whether the challenged regulation is consistent with the principles that underpin our regulatory tradition," courts "must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 142 S. Ct. at 2132). This inquiry turns on "[w]hy and how the regulation burdens the right." *Id.* A modern regulation shares a "why" with a historical analogue when a legislature imposed it "for similar

reasons." *Id.* And a modern regulation shares a "how" with a historical analogue when it burdens the right to bear arms "to an extent [not] beyond what was done at the [F]ounding." *Id.* The government ultimately "bears the burden" to prove that a modern regulation is "'relevantly similar' to laws that our tradition is understood to permit." *Id.* at 1897–98 (quoting *Bruen*, 142 S. Ct. at 2132).

Even if we assume that "the Constitution presumptively protects" felons' right to possess firearms and ammunition, the felon-in-possession ban likely does not run afoul of the Second Amendment because "it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. Two Founding-era traditions—the punishment of felons with death and forfeiture and the categorical disarmament of groups deemed to pose a risk of misusing firearms—together support the conclusion that section 922(g)(1) is "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. I address each of these "distinct legal regimes" in turn. *Id.* at 1899.

There is a long tradition of legislatures subjecting felons to severe punishment for their crimes. In eighteenth-century England, "[t]he idea of [a] felony" was "so generally connected with that of capital punishment, that . . . it [was] hard to separate them." 4 WILLIAM BLACKSTONE, COMMENTARIES *98. Felony convictions often led to the escheat of the felon's estate and the forfeiture of his real and personal property. *Id.* at *94, *380–86. Even felons convicted of nonviolent offenses like fraudulent bankruptcy, violating quarantine, or forging a marriage license faced capital punishment

22-10829          WILLIAM PRYOR, C.J., Concurring          3

and forfeiture of their property. *Id.* at \*94–95, \*156, \*161–63. And when legislatures exercised discretion to "make[] any new offen[s]e [a] felony, the law implie[d] that it shall be punished with death . . . as well as with forfeiture." *Id.* at \*98; *see also* 1 MATTHEW HALE, THE HISTORY OF THE PLEAS OF THE CROWN 703 (London, E. & R. Nutt & R. Gosling 1736) (noting that "there may be and frequently are in acts of parliament . . . [the] making [of] new felonies").

In America, death continued to be "the standard penalty for all serious crimes at the time of the [F]ounding." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1122 (2019) (citation and internal quotation marks omitted). At the Founding, "felonies included treason, murder, homicide, burning of houses, burglary, robbery, rape, chance-medley, and petit larceny[,] and . . . punishments for felonies ranged from death and forfeiture of goods and chattels to terms of imprisonment and hard labor." *United States v. Campbell*, 743 F.3d 802, 811 (11th Cir. 2014) (citing 2 TIMOTHY CUNNINGHAM, A NEW AND COMPLETE LAW DICTIONARY (3d ed. 1783)). Notably, as in England, colonies—and later states—continued routinely to sentence to death even those convicted of nonviolent felonies like counterfeiting and theft. *See* STUART BANNER, THE DEATH PENALTY: AN AMERICAN HISTORY 7–8, 131, 140 (2002); *United States v. Duarte*, No. 22-50048, slip op. at 57 & nn.9–10 (9th Cir. May 9, 2025) (en banc) (Collins, J., concurring in the judgment).

Some jurists have warned against relying on this tradition because "[d]uring the period leading up to the [F]ounding, the connection between felonies and capital punishment started to fray."

*E.g.*, *Kanter v. Barr*, 919 F.3d 437, 459 (7th Cir. 2019) (Barrett, J., dissenting). As we have explained, "[a]t the time of the Founding, there was ambiguity in the meaning of a felony." *Campbell*, 743 F.3d at 811 (alteration adopted) (citation and internal quotation marks omitted). But that some Founding-era legislatures began to impose lesser sentences for some felonies does not mean that modern legislatures have since lost the power to punish felonies severely. *Cf. Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1125 (11th Cir. 2025) (en banc) ("That Florida has lowered the age of majority for some rights does not mean that it has less power to restrict the rights of minors than it did at the Founding."); *see also Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring) (cautioning against "assum[ing] that [F]ounding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority"). Indeed, that felonies encompassed more criminal conduct and had more varied punishment at the Founding than they did at common law in England confirms the breadth of legislative discretion to decide which crimes are serious enough to be designated as felonies and how to punish them. *Cf. Campbell*, 743 F.3d at 811. And, crucially for understanding the outer bounds of this power, the practice of punishing even nonviolent felonies with death persisted at the Founding. *See* BANNER, *supra*, at 7–8, 131, 140.

There is also a long tradition of legislatures categorically disarming certain groups of people thought to "present a special danger of misuse." *Rahimi*, 144 S. Ct. at 1901. In the centuries leading up to the Founding, "English law . . . disarmed not only brigands and highwaymen but also political opponents and disfavored

religious groups." *Id.* at 1899. Among other examples, Parliament enacted a law that barred any Catholic who did not renounce his faith from "hav[ing] or keep[ing] in his House or elsewhere . . . any Arms[,] Weapons[,] Gunpowder[,] or Ammunition (other th[a]n such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace . . . for the defen[s]e of his House or person)." An Act for the Better Secureing the Government by Disarming Papists and Reputed Papists 1689, 1 W. & M., Sess. 1, c. 15 (Eng.). This "disarmament of Catholics . . . reflect[ed] Protestant fears that Catholics could not be trusted to obey the law"—not "the notion that every single Catholic was dangerous." *Range v. Att'y Gen. U.S.*, 124 F.4th 218, 256 (3d Cir. 2024) (en banc) (Krause, J., concurring in the judgment); *see also* ADAM WINKLER, GUNFIGHT: THE BATTLE OVER THE RIGHT TO BEAR ARMS IN AMERICA 115 (2011) (explaining that "the Protestant majority" enacted these laws because they viewed Catholics as "untrustworthy").

The English tradition of group disarmament carried over to America. Virginia initially "disarmed nonconformist Protestants in the 1640s due to their rejection of the King's sovereign power over religion." *Range*, 124 F.4th at 258 (Krause, J., concurring in the judgment). And then it, along with Maryland and Pennsylvania, enacted statutes in the 1750s that disarmed Catholics. *See* Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249, 263 (2020). Several colonies imposed group restrictions for nonreligious reasons too. Maryland, for example, "disarmed anyone who refused to take an oath of allegiance to King George III," and Connecticut "disfranchised

and prohibited from keeping arms, holding office, or serving in the military" anyone "who libeled or defamed acts of the Continental Congress." *Id.* at 263–64. In addition, "[l]aws disarming groups such as slaves, freed blacks, Indians, and those of mixed-race ancestry were common." SAUL CORNELL, A WELL-REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA 28–29 (2006). And even though "state constitutions and the Second Amendment had largely eliminated governmental authority to disarm *political opponents* on this side of the Atlantic" by the time of the Founding, *Rahimi*, 144 S. Ct. at 1899 (emphasis added), "the pernicious tradition of prohibiting slaves and Native Americans from possessing firearms persisted" after ratification, *Range*, 124 F.4th at 264 (Krause, J., concurring in the judgment); *see also* STEPHEN P. HALBROOK, THE RIGHT TO BEAR ARMS: A CONSTITUTIONAL RIGHT OF THE PEOPLE OR A PRIVILEGE OF THE RULING CLASS? 226 (2021) (explaining that the restrictions on slaves lasted "[f]rom colonial times until slavery was abolished").

Fortunately, most of these regulations would be impermissible if enacted today. Other constitutional provisions, including the First and Fourteenth Amendments, prohibit categorical disarmaments based on religion or race. *See* U.S. CONST. amends. I, XIV. And these constitutional prohibitions may undermine the persuasive power or analogical usefulness of the categorical disarmaments. But because "[h]istorical laws disarming disaffected groups . . . have a long lineage stretching all the way back to England and at least imply an understanding of the right to keep and bear arms that allowed for disarmament of large segments of the

22-10829          WILLIAM PRYOR, C.J., Concurring          7

population," Joseph Blocher & Caitlan Carberry, *Historical Gun Laws Targeting "Dangerous" Groups and Outsiders*, *in* NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY 131, 143–44 (Joseph Blocher et al. eds., 2023), courts might be remiss to ignore them in our attempt to decipher "the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898.

The principles underlying this tradition could justify only a narrow set of modern regulations. As Judge Collins has explained, although "[t]he tradition that emerges from these historical precedents is not particularly impressive," it does appear to "recognize[] some measure of legislative discretion to impose disarmament on particular categories of persons who are thought to present a 'special danger of misuse.'" *Duarte*, slip op. at 48, 50 (Collins, J., concurring in the judgment) (quoting *Rahimi*, 144 S. Ct. at 1901). And *United States v. Rahimi* suggests that "a special danger of misuse" might be a sufficient legislative rationale for "banning the possession of guns by categories of persons." 144 S. Ct. at 1901. Yet courts would be wise to "confin[e] any legislative categorical disarmament power to only those historically based classes of persons who could be subjected to equivalent or greater disabilities" at the Founding to "avoid[] endorsing the sort of freewheeling legislative power to categorically disarm that the Second Amendment sought to eliminate." *Duarte*, slip op. at 52 (Collins, J., concurring in the judgment). Felons often faced punishment more severe than disarmament at the Founding. So the tradition of group disarmament might inform the constitutionality of felon-in-possession bans

today. In contrast, this tradition would not support disarmament of other groups that did not face comparable punishment at the Founding on the ground that a legislature today is concerned that the group might misuse firearms.

With these principles in mind, the long tradition of punishing felons with death and forfeiture when considered with the long tradition of categorically disarming certain groups deemed to pose a risk of misusing firearms is likely sufficient to uphold section 922(g)(1). The felon-in-possession ban shares a similar "why" with these historical analogues. Punishment of those convicted of felonies—both at the Founding and now—has been motivated by a desire to "cut[] [them] off from the power of doing further mischief." Joseph Story, *Death Punishment*, *in* 4 ENCYCLOPEDIA AMERICANA 140–45 (1st ed. 1830), *reprinted in Joseph Story on Capital Punishment*, 43 CALIF. L. REV. 76, 80 (John C. Hogan ed., 1955); *accord* 4 BLACKSTONE, *supra*, at *11–12 (listing "depriving the party injuring of the power to do future mischief" as a legitimate object of punishment); *see also Duarte*, slip op. at 59 (Collins, J., concurring in the judgment) (observing that "the death penalty, like disarmament, is in part aimed at addressing the problem of potential future lawlessness by demonstrated lawbreakers"). Group disarmaments were often based on similar concerns, as the "historical record suggests that legislatures traditionally possessed discretion to disqualify categories of people from possessing firearms to address a danger of misuse by those who deviated from legal norms, not merely to address a person's demonstrated propensity for violence." *United States v. Jackson*, 110 F.4th 1120, 1127 (8th Cir. 2024) (Colloton, C.J.).

22-10829        WILLIAM PRYOR, C.J., Concurring        9

The felon-in-possession ban is also comparable to these historical analogues in "how" it burdens the right to bear arms. In *Rahimi*, the Supreme Court ruled that "if imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the *lesser restriction* of temporary disarmament that [s]ection 922(g)(8) imposes is also permissible." 144 S. Ct. at 1902 (emphasis added). That felons could be permanently deprived of their rights to life, liberty, and property at the Founding suggests that class-wide disarmament of all felons today would be "permissible" as a "lesser restriction." *Id.*; *see also Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) ("[I]t is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms.").

This conclusion that the "how" of section 922(g)(1) is sufficiently analogous is bolstered when legislatures' wide latitude to punish felons severely is "[t]aken together" with the long tradition of categorical disarmament of groups identified to be at risk of misusing firearms. *Rahimi*, 144 S. Ct. at 1901. Because Founding-era legislatures "had a recognized power to define serious crimes as felonies, and to attach the penalty of death and forfeiture of estate to them, the category of convicted 'felons' is one that then could categorically be subjected to legal disabilities that equaled or exceeded lifetime disarmament." *Duarte*, slip op. at 58 (Collins, J., concurring in the judgment). Considering these traditions together also guards against stretching *Rahimi*'s endorsement of greater-includes-the-lesser reasoning too far. "Stripping convicted felons of

their First Amendment rights is also less severe a consequence than death, but no one could seriously contend that such a statute would be consistent with the First Amendment." *Id.* at 59 n.11. Yet, here, "[t]he crucial difference is that, in the context of the Second Amendment (in contrast to the First Amendment), there was, at the time of the [F]ounding, a well-recognized (if limited) legislative power to strip specified *categories of persons* of their right to bear arms." *Id.* And "there [was] no [historical] requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons." *Jackson*, 110 F.4th at 1128; *accord Duarte*, slip op. at 36–37. This measured understanding of the limits of these historical analogues avoids "read[ing] a principle at such a high level of generality that it waters down the right." *Rahimi*, 144 S. Ct. at 1926 (Barrett, J., concurring); *see also Bruen*, 142 S. Ct. at 2133 (stating that "courts should not uphold every modern law that remotely resembles a historical analogue" (citation and internal quotation marks omitted)). When the interplay between the principles underlying these two long traditions is considered, section 922(g)(1) does not appear to regulate the right to bear arms "to an extent beyond what was done at the [F]ounding." *Rahimi*, 144 S. Ct. at 1898.

Notably, section 922(g)(1) does not apply to all felons nor impose permanent disarmament. Section 921(a)(20) excludes from the class of felons barred from possessing firearms those whose "offenses pertain[ed] to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices." 18 U.S.C. § 921(a)(20)(A). That same

section also exempts felons from coverage when their underlying convictions "ha[ve] been expunged . . . or set aside," they "ha[ve] been pardoned," or they "ha[ve] had [their] civil rights restored." *Id.* § 921(a)(20). And section 925(c) permits felons to apply to the Attorney General "for relief from the disabilities imposed by [section 922(g)(1)]," *id.* § 925(c)—although this option has been "rendered inoperative" because Congress has barred the Attorney General from using appropriated funds to review these applications, *see Logan v. United States*, 552 U.S. 23, 28 n.1 (2007). That a modern "law is less restrictive than the law at the Founding in some ways" can be evidence that the modern law is "consistent with our regulatory tradition in 'how' it burdens the right," *Nat'l Rifle Ass'n*, 133 F.4th at 1123, so these features of how section 922(g)(1) operates in practice further support its constitutionality.

The lack of directly on-point Founding-era laws is neither dispositive nor surprising. The Supreme Court has made clear that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Rahimi*, 144 S. Ct. at 1897–98. It has also counseled that "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 142 S. Ct. at 2133. "To require that a modern law perfectly match a law from the Founding era erroneously 'assumes that [F]ounding-era legislatures maximally exercised their power to regulate.'" *Nat'l Rifle Ass'n*, 133 F.4th at 1115 (quoting *Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring)). And "[t]raditions are *reflected in* practices, but . . . are not *reducible to* practices," so *New York State Rifle & Pistol Ass'n*

*v. Bruen* "does *not* impose a mechanical test in which the government must find the same kind of historical law for every modern law it wishes to enact." J. Joel Alicea, Bruen *Was Right*, 174 U. PA. L. REV.    (forthcoming    2025)    (manuscript    at    22), https://perma.cc/C592-T8GA. As such, the absence of a law explicitly banning felons from possessing firearms and ammunition at the Founding is not fatal to the constitutionality of section 922(g)(1).

The absence of a historical analogue that more closely resembles section 922(g)(1) is potentially explainable because it was understood at the Founding that criminals could be deprived of the right to bear arms. Several sources suggest that an individual's law-abiding status was connected to his right to bear arms. Antifederalists at the Pennsylvania ratifying convention proposed a precursor to the Second Amendment that stated, "[T]he people have a right to bear arms . . . ; and no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals." 2 BERNARD SCHWARTZ, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 662, 665 (1971) (emphasis added). At Massachusetts's ratifying convention, Samuel Adams offered an amendment that the "Constitution be never construed to authorize Congress . . . to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." *Id.* at 675, 681 (emphasis added). And the town of Williamsburg, Massachusetts, supported adding a right to bear arms to the state constitution because "we esteem it an essential priviledge to keep Arms in Our houses for Our Own Defence and while we Continue honest

and *Lawfull* Subjects of Government we Ought Never to be deprived of them." THE POPULAR SOURCES OF POLITICAL AUTHORITY: DOCUMENTS ON THE MASSACHUSETTS CONSTITUTION OF 1780, at 624 (Oscar Handlin & Mary Handlin eds., 1966) (emphasis added). Because "it has always been widely understood that the Second Amendment . . . codified a *pre-existing* right," *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008), these sources inform the meaning of the Second Amendment as eventually ratified to at least some degree despite their different language.

Some jurists have suggested that these proposals do not "support[] a legislative power to categorically disarm felons because of their status as felons" in part because "none of the relevant limiting language made its way into the Second Amendment." *E.g.*, *Kanter*, 919 F.3d at 454–58 (Barrett, J., dissenting); *see also Rahimi*, 144 S. Ct. at 1935–36 & n.3 (Thomas, J., dissenting) (contending that "[t]hese proposals carry little interpretative weight"). But some scholars of the Second Amendment have concluded that supporters of a constitutional right to bear arms "did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms" because that limitation "was understood." STEPHEN P. HALBROOK, THE FOUNDERS' SECOND AMENDMENT: ORIGINS OF THE RIGHT TO BEAR ARMS 273 (2008); *see also* Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 266 (1983) (concluding that "the Founders" did not "consider[] felons within the common law right to arms [n]or intend[] to confer any such right upon them"). Admittedly, this evidence would be insufficient to justify the felon-in-

possession ban on its own. Yet because the Supreme Court has rejected "the proposition, unsupported by any evidence, that different people of the [F]ounding period had vastly different conceptions of the right to keep and bear arms," *Heller*, 554 U.S. at 604–05, the existence of multiple sources suggesting that the right to bear arms might depend on one's law-abiding status supports the conclusion that section 922(g)(1) fits within "the Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2130.

In the light of all these considerations, I would likely uphold the felon-in-possession ban, as applied to Dubois, under *Bruen* and *Rahimi*, even if I were not bound by *United States v. Rozier*. These considerations also explain why the Supreme Court in *District of Columbia v. Heller* cautioned that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." 554 U.S. at 626. And they explain why several justices have repeated that caution since *Heller*. *See, e.g.*, *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill' . . . . We repeat those assurances here." (quoting *Heller*, 554 U.S. at 626)); *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) (stating that *Bruen* did not "disturb[] anything that we said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns"); *id.* at 2162 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (repeating the reassurances about felon-in-possession laws made in *Heller* and *McDonald*); *id.* at 2189 (Breyer, J.,

22-10829          WILLIAM PRYOR, C.J., Concurring          15

dissenting, joined by Sotomayor and Kagan, JJ.) (explaining that *Bruen* "cast no doubt on . . . *Heller*'s holding" that laws restricting firearm possession by felons are presumptively lawful); *Rahimi*, 144 S. Ct. at 1902 (reiterating *Heller*'s statement that "many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful'" (quoting *Heller*, 554 U.S. at 626, 627 n.26)); *id.* at 1923 (Kavanaugh, J., concurring) (reaffirming that *Heller* recognized felon-in-possession laws among "a few categories of traditional exceptions to the right" and *McDonald* "reiterated the presumed constitutionality" of those laws).

22-10829                ABUDU, J., Concurring                1

ABUDU, Circuit Judge, joined by ROSENBAUM, Circuit Judge, concurring:

I concur in the majority opinion, which affirms Andre Dubois' conviction and sentence for being a "felon in possession" of a firearm under 18 U.S.C. § 922(g)(1). I write separately to simply underscore the perils of relying on antiquated, legally questionable, and often-rejected notions of fairness and justice when determining whether the modern-day application of laws is constitutionally permissible.[1] To quote a colleague, "I remain troubled by *Bruen*'s myopic focus on history and tradition, which fails to give full

---

[1] I acknowledge, as Chief Judge Pryor does in his concurrence, that the Fourteenth Amendment safeguards against obviously racist, sexist, or otherwise discriminatory laws. However, the practice of relying solely on laws enacted during a time when women and people of color were denied a seat at the legislative table is, in and of itself, problematic. *See* Reva B. Siegel, *How "History and Tradition" Perpetuates Inequality:* Dobbs *on Abortion's Nineteenth-Century Criminalization*, 60 HOUS. L. REV. 901, 906 (2023) ("The tradition-entrenching methods the Court employed to decide *Bruen* and *Dobbs* tie the Constitution's meaning to lawmaking of the past and so elevate the significance of laws adopted at a time when women and people of color were judged unfit to participate and treated accordingly by constitutional law, common law, and positive law."); *accord Littlejohn v. Sch. Bd. of Leon Cnty.*, 132 F.4th 1232, 1266 (11th Cir. 2025) (Rosenbaum, J., concurring). Furthermore, some archaic laws were enacted based on discriminatory beliefs that may not be patently evident. *See* Cary Franklin, *History and Tradition's Equality Problem*, 133 YALE L. J. F. 946, 954 (2024) ("Many of the historical traditions proponents of 'history and tradition' wanted to treat as the sole determinant of the Second Amendment's meaning 'bore the ugly taint of racism,'" which "complicate[s] the application of the history-and-tradition approach in the Second Amendment context." (quotation and citation omitted)).

consideration to the real and present stakes of the problems facing our society today." *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1160 (11th Cir. 2025) (*en banc*) (Wilson, J., concurring).

I will not redo an analysis of the obvious technical challenges, including missing gaps, inherent in requiring jurists to identify, research, and then analyze our nation's history, as Justice Breyer thoroughly laid out these pitfalls in his dissent in *Bruen*. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 111-30 (2022) (Breyer, J., dissenting).[2]  Whether we call it "means-end scrutiny" or "strict scrutiny," the historically-applied tailoring test for determining whether a law that infringes upon a fundamental right advances a compelling government interest continues to be more instructive, practical, and consistent.  This is so because instead of simply scavenging through historical documents, courts first identify the fundamental right and then reasonably assess whether the law narrowly addresses matters of current-day significance (*i.e.*, "compelling government interests"), an inquiry judges are better equipped to evaluate.  *See, e.g.*, *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011) (identifying a California law that prohibited the sale of

---

[2] *See also Bruen*, 597 U.S. at 111 (Breyer, J., dissenting) ("Lower courts—especially district courts—typically have fewer research resources, less assistance from amici historians, and higher caseloads than we do.  They are therefore ill equipped to conduct the type of searching historical surveys that the Court's approach requires.  Tellingly, even the Courts of Appeals that have addressed the question presented here . . . 'have, in large part, avoided extensive historical analysis.'  In contrast, lawyers and courts are well equipped to administer means-end scrutiny, which is regularly applied in a variety of constitutional contexts[.]").

22-10829                    ABUDU, J., Concurring                        3

violent video games to minors as implicating the fundamental right to free speech, but evaluating the state's present-day compelling interest in enacting the law before determining its constitutionality). Because there are several compelling government interests narrowly advanced through Section 922(g)(1)—which restricts access to firearms from those who already have proven themselves to be a physical danger to society—the government has also met its burden for purposes of defending the constitutionality of Section 922(g)(1) under "strict scrutiny" or "means-end scrutiny." For this additional reason, I concur.