**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 24-11948

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

DEION LARRY JAMAR MANGUM,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:23-cr-00296-RAH-CWB-1

_____

Before JORDAN, ROSENBAUM, and ABUDU, Circuit Judges.

PER CURIAM:

Deion Larry Jamar Mangum appeals his conviction for possession of a firearm as a convicted felon, 18 U.S.C. § 922(g)(1). Mangum makes three arguments on appeal. First, he contends that

Section 922(g)(1) is unconstitutional.  Second, he argues that the district court abused its discretion by admitting certain evidence offered by the government.  Third, he asserts his conviction is not supported by sufficient evidence.  After careful review, we reject each of these arguments and affirm.

## I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

Mangum was indicted, in September 2023, with one count of possessing a firearm as a convicted felon, 18 U.S.C. § 922(g)(1).  The underlying charge arose from an incident which began as a domestic dispute between Mangum and his ex-girlfriend, Shayalia Bradford, on November 7, 2022.  During their response to that incident, officers recovered a firearm in the brush outside Bradford's house and arrested Mangum.

### Pretrial Evidentiary Rulings

Mangum pled not guilty, and the case proceeded to trial.  The first trial ended in a mistrial after the jury could not reach a unanimous verdict.  Before the second trial, the government filed a notice of its intent to offer evidence of other crimes, wrongs, or acts under Federal Rule of Evidence 404(b).  It explained it wished to offer evidence that Mangum conspired with his brother, DeAndre Scott, to commit witness tampering, in violation of 18 U.S.C. §§ 1512(b) & 371.  The government argued that evidence of this witness tampering scheme was admissible because it was relevant to show Mangum's consciousness of his guilt in this case.

The government described a call Mangum made from the Montgomery County Jail to Scott, during which Mangum asked

24-11948                 Opinion of the Court                 3

Scott if he had spoken to Bradford, and asked Scott to look her up. The government described messages from Scott to Bradford asking her not to come to court during Mangum's trial and offering her money to not show up. It explained that Bradford contacted law enforcement after Scott contacted her and law enforcement directed her to continue the conversation. It also detailed how Scott had given a statement to officers explaining that Mangum had directed him to contact Bradford to dissuade her from testifying. It contended the probativeness of this evidence outweighed any unduly prejudicial effect.

The government provided recordings of the jail phone calls and screenshots of the Facebook messages, which show the following. First, the October 16, 2023, phone call between Mangum and Scott includes this conversation:

> Mangum: Did she ever text you back?
>
> Scott: Huh? Oh, no.
>
> Mangum: She didn't? She read it?
>
> Scott: Nope. Uh-uh.
>
> Mangum: Huh?
>
> Scott: Nope.
>
> Mangum: She must be locked up or something.
>
> Scott: I don't know [unintelligible]
>
> Mangum: Look her up in the county sheriff's department and see if [she is] locked up.

> Scott: Yeah, I'll do it. I'm gonna do it when I get at home because I ain't gonna have no wifi.
>
> Mangum: Alright.
>
> Scott: That her real name?
>
> Mangum: Yeah.
>
> Scott: Alright then.
>
> Mangum: It should say "uh" it should say "uh" it might be it might be Bradford.
>
> Scott: Alright.
>
> Mangum: B-R-A-D-F-O-R-D
>
> Scott: Huh?
>
> Mangum: It might be Bradford. [unintelligible] But . . . you should be able to put her first name in and it should come up.

The next day, October 17, Scott contacted Bradford on Facebook. Scott stated that Mangum was "trying to call" her and Bradford responded, "My phone [is] not on." Bradford then provided a phone number to Scott. The following messages, dated October 20, read as follows.

> Scott: Aye y[o]u take s[o]m[e] cash just for not to show [up] to my brother['s] court day
>
> Bradford: How much y[o]u talking
>
> Scott: Hw yu want
>
> Bradford: Throw me a number
>
> Scott: Let me see

Mangum objected to this evidence, arguing that it was irrelevant and unduly prejudicial.  First, Mangum argued that his conversation with Scott occurred before he was even aware of the government's intent to prosecute him.  Second, he argued he did not instruct Scott to persuade Bradford nor discuss paying Bradford.  Instead, the call simply reflected that he was asking Scott if he had been in touch with Bradford.  Third, he argued there was no evidence that he expressed any intention to use money to dissuade Bradford from testifying.  Finally, he argued Scott's messages to Bradford were inadmissible hearsay because he did not make or endorse them.

During the first day of trial, the parties discussed the government's proposed evidence and Mangum's outstanding objection.  The government summarized the phone call and argued that it was significant because Scott contacted Bradford the next day.  It explained that, at the time of the conversations, Mangum had been indicted but not arraigned in this case and was in state custody.  It also contended that, if he was unaware of the indictment in this case, he was aware there were supervised release revocation proceedings pending against him based on the same facts.[1]

Mangum argued the government did not intend to call Scott as a witness and that Scott's statements were inadmissible hearsay.  He asserted that the phone call and the Facebook messages were

---

[1] Mangum's supervised release was later revoked in another case for the conduct underlying this case.  Because he makes no arguments about the supervised release proceedings in this appeal, we do not describe them at length.

several weeks apart and that he and his brother had discussed many things on their calls besides Bradford. He also noted that he did not directly ask Scott to offer Bradford money or express a desire that Bradford not testify. He contended the statements were highly prejudicial and that Scott had contacted Bradford of his own volition and not because he had asked Scott to do so.

The government argued that Scott's statements were not hearsay under Federal Rule of Evidence 801(d)(2)(E), because they were statements made by Mangum's co-conspirator. It asserted that Mangum and Scott were in a conspiracy to commit witness tampering, and that Scott admitted as much in a later interview. It conceded that Scott would not, most likely, testify. Yet it contended that Scott's statements to Bradford were still admissible because the statements were made in furtherance of the conspiracy and it could prove the conspiracy existed because Scott admitted to it. Mangum disagreed, arguing that, without the inadmissible statement by Scott about the conspiracy, the government could not prove the conspiracy existed because Mangum did not discuss bribing Bradford on any of the phone calls. The government also argued the statements were admissible under Rule 404(b) to show Mangum's consciousness of guilt. Mangum responded that there was only speculation that there was a conspiracy, which, in his view, was insufficient to allow the evidence in at trial.

In support of its position, the government called Special Agent Julius Porter, from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), who testified about the alleged

conspiracy outside the jury's presence.  He testified that Bradford had contacted him in October 2023 after Scott contacted her.  Bradford told him that Scott had messaged her on Facebook asking for her phone number, but she had provided Scott a fake number.  A few days later, Scott asked her how much money she would take to avoid showing up at trial.  Bradford provided Porter a screenshot of these messages.  Porter instructed Bradford to continue the conversation to see if Scott would provide an actual amount he was willing to pay.  Bradford continued the conversation and provided those messages to Porter.

After learning about Scott's message to Bradford, Porter investigated Scott's calls with Mangum.  He located a call from Mangum placed to Scott on October 16, 2023.  The government admitted the phone call—consistent with the transcript reproduced above—and played it for the court.  Porter also explained that Scott's Facebook account was connected to the same phone number that Mangum used to call Scott on October 16.

Porter then asked Scott to participate in a voluntary interview and Scott agreed to do so.  Porter provided Scott *Miranda* warnings, and Scott agreed to speak to Porter.  Scott told Porter that he had sent the messages to Bradford to help Mangum "get . . . off the hook."  He also stated that Mangum had directed him to get a hold of Bradford and to offer her money.  Mangum also made other phone calls while incarcerated, attempting to get others to influence Bradford's testimony.  However, Porter admitted Mangum had not specifically directed Scott to offer Bradford

money.  As far as he was aware, the Facebook messages between Scott and Bradford constituted the entirety of the conversation, and Scott made no further attempts to contact Bradford.  Porter also explained that Mangum and Bradford spoke on the phone during this time and Mangum had not, to his knowledge, directly asked Bradford not to testify or offered her money.

The government conceded that Scott's statements to Porter were inadmissible hearsay and agreed that it would not introduce those.  Still, it argued that the Facebook messages and the phone call between Scott and Mangum were admissible because Scott and Mangum conspired to bribe a witness.  Mangum argued that the phone call did not reference Bradford testifying or paying Bradford at all.  He reiterated that Bradford never alleged that Mangum offered her money or asked her not to testify and there was no other phone call where Mangum followed up with Scott about Bradford. The government responded, arguing that, while Mangum did not explicitly direct Scott to bribe Bradford, the court could "read between the lines" and see that there was no other purpose for which Mangum would reasonably ask Scott to contact Bradford.

The court overruled Mangum's objection.  It found that the government met its burden and that the statements were admissible under Rule 801(d)(2)(E).  Mangum reiterated his objection to the admission of the phone calls, arguing that they were not sufficient evidence of a conspiracy, and that the prejudicial aspect of the calls outweighed their probative value.  The government argued there was nothing prejudicial about the fact that Mangum was in

jail.  The court asked if Mangum would stipulate that it was he on the phone if the government would remove the opening portion of the call stating that the call was from jail, and Mangum agreed. Even so, Mangum maintained a standing objection to the admission of the evidence of the conspiracy and of witness tampering.

*Evidence Presented to the Jury*

After the parties' opening statements, the following evidence was presented to the jury.[2]  The government's first witness was Henry Wentland, a lieutenant with the Pike County Sheriff's Department, who testified that he and several other officers responded to a domestic dispute involving a firearm in November 2022.  On that day, he was wearing a body-worn camera.  When he first arrived, he spoke to Bradford, who was sitting on the steps of her neighbor's residence.  The government published Wentland's body-worn camera footage to the jury, which, along with testimony from other officers from the Pike County Sheriff's Department—namely Wentland, Lieutenant Kevin Childs, and Lieutenant Troy Johnson—showed the following.

Childs and Johnson were the first to arrive on the scene.  As they arrived, Mangum turned and entered Bradford's house.  Once Wentland arrived, he exited his vehicle and walked up to a woman

---

[2] "We 'view the evidence in the light most favorable to the government and resolve all reasonable inferences and credibility evaluations in favor of the jury's verdict.'"  *United States v. Robertson*, 493 F.3d 1322, 1339 (11th Cir. 2007) (quoting *United States v. Tinoco*, 304 F.3d 1088, 1122 (11th Cir. 2002)).  For readability, we omit evidence not relevant to the issues raised on appeal.

on the steps of a residence—identified as Bradford—who stated that her boyfriend, Mangum, had locked himself in her nearby house and would not leave. She said she had broken up with him the day before. Bradford's first statement to Wentland was that she was scared because she did not want her house taken from her. One of the officers asked what type of gun Mangum had and Bradford replied, "A big gun"—holding up her arms to show that it was a long gun—and she specified the gun had a "brown thing on it." She explained that Mangum had the gun in the house and that she asked him to take it out of the house, but he had refused. She also stated that Mangum was on probation and was not supposed to be possessing a gun.

Wentland walked towards Bradford's house, and a second officer could be heard speaking to Mangum. The officers then jointly interviewed Mangum while he stood in the doorway of Bradford's house. Mangum told the officers that Bradford was depressed and did not take her medications. He explained that his tire was flat, but he would be able to leave in five minutes when it was refilled. Mangum then filled up his tire while they spoke, and, ultimately, Childs went back into Bradford's house with Mangum to collect Mangum's belongings.

Wentland asked Mangum if he had a gun, and Mangum shook his head no. Mangum and the officers entered Bradford's house to gather Mangum's belongings, and Mangum took them out to his car. Wentland told Mangum that he could head back to Montgomery. Bradford then reentered the house, and Wentland

told her that they did not find a gun. Outside the house, Wentland said to Mangum, "You don't know where your phone is?" and Mangum shook his head in the affirmative. Wentland asked if they could search the truck for a gun, and Mangum consented. Wentland searched the truck but did not find a gun.

An officer offered to call Mangum's phone, and Mangum provided his phone number. The officer walked into the house and asked if anyone heard a phone ringing. Childs testified that he had been searching for the firearm and had gone into the backyard to search for it. While there, he heard a phone ringing, so he looked for the phone. He knew that Bradford was looking for her phone, and he retrieved a phone from the yard, recognizing the number calling the phone as Johnson's. When he found the phone, he also found a firearm laying just inside the tree line.

Subsequently, Childs exited Bradford's house holding a phone and asked if it was Mangum's. Mangum replied that it was his and that the phone he was carrying was another phone of his. Childs then asked Mangum to place his hands on the hood of the vehicle and placed him in handcuffs. Mangum asked what he was under arrest for, and the officer replied that there was an "AK-47 laying out in the bushes." The officer explained that he had found Mangum's ringing phone in the bushes next to the gun.

Childs then took the phone back to where he found it and photographed it. The government introduced a photograph of the phone near the firearm in the brush. Childs confirmed the firearm

photographed in the woods was the same firearm in court. He took the firearm into possession, and it was logged into evidence.

Wentland conceded that Bradford had made some inconsistent statements on the video that "could" cause him to doubt her truthfulness. Finally, he explained that he turned off his camera and left when instructed to do so by Childs. Childs similarly discussed certain potential gaps in the evidence. For instance, there was no video evidence of Childs recreating the scene with the phone after finding the firearm, and officers never obtained surveillance footage from the trailer park. He added that the back door of Bradford's house was not tested for fingerprints. Childs also agreed that Bradford had made some inconsistent statements, for instance by initially stating that Mangum did not do drugs but then saying that, if anyone smoked marijuana in her house, it was Mangum. After Mangum was placed in custody, Bradford held the phone that Childs had found near the gun for about five minutes. For that reason, Childs stated he could not be sure that the phone he later retrieved from Bradford was the same phone he first found in the bushes. He believed the phone belonged to Mangum, however, because Johnson told him he had called Mangum's phone, and Bradford confirmed the phone was not hers.

The government also called Ashanti Adams, Bradford's neighbor, who testified that, on the day of the incident, she saw Bradford's oldest son outside crying. Bradford then came to her door crying. Bradford said she called the landlord to ask him to call the police. Bradford waited for the police in Adams' house. Adams

stated that she saw Mangum walking around his car while the two waited for the police. She saw Mangum retrieve a gun from his truck. The gun was black with a brown handle. The government showed a photo of a gun, and Adams stated that it was the gun she saw Mangum holding.

Bradford also testified, explaining that Mangum was her ex-boyfriend. On November 6, she returned home from a night out with friends, and Mangum was waiting for her at her mother's residence in Montgomery. She told Mangum she did not want to see him and asked him to leave. Mangum instead followed her back to her home in Brundidge. She saw Mangum's truck outside her house and instructed her daughter not to let Mangum in, but her daughter did so. The next morning, Bradford awoke and saw Mangum sleeping on the sofa. She noted that Mangum had a "heavy" black backpack with him when she first saw him that morning. The two got into an argument, and Mangum said he would not leave until they could talk. Bradford told Mangum to leave, and Mangum grabbed her by her nightgown and ripped it.[3] While they were arguing, she tried to call her mom, and Mangum "snatched" her phone. Bradford sent her son to Adams' house to call someone, put a robe on, and went to Adams' house as well. At Adams' house, she used Adams' phone to call her landlord to ask him to call the police because she thought the police would arrive faster if the landlord asked.

---

[3] Officers conceded, however, that they did not collect a ripped nightgown from the scene.

From Adams' house, she saw Mangum in the doorway of her own house holding a gun, and he sat down with the gun. The gun was "black and brown . . . like a mini shotgun." When showed a picture of the gun recovered by police, Bradford testified that that was the gun she saw Mangum holding. While waiting on police, Bradford messaged Mangum to tell him that he should leave because police were on the way, and Mangum replied that they would have to kill him. The government introduced a screenshot of these messages. Bradford waited at Adams' house for an hour and 45 minutes.

When the police arrived, Mangum went back into Bradford's house and closed the door and Bradford exited Adams' house to speak with the officers. Bradford told the police that she did not want to lose her housing due to Mangum's actions. She knew that incidents involving guns or marijuana could cause her to lose her housing. After the officers arrived, Bradford went with an officer into her house to find her phone and keys, but she did not move anything. Bradford noticed that crates which had been blocking her back door had been moved and the back door was damaged. Mangum and the police were the only people who entered her house during that time.

Bradford next testified about her communications with Scott. She identified the government's exhibits as messages she received from Scott. She explained that she had provided Scott a fake phone number so Mangum could not contact her. When Scott messaged her about taking cash to not show up to court, she

interpreted that to mean that he was asking if she would accept money to not be there. She contacted Porter after receiving the message. Porter directed her to respond by asking Scott how much he was willing to offer. Scott then "unsen[t]" the message on Facebook. Bradford explained that she had known Mangum since high school. They were in an "off and on" relationship from 2016 onward. She also clarified the timeline of the day of the incident and explained that she had asked Mangum to meet her at her mother's house in Montgomery the day before. During that night, she conveyed to Mangum that she wished to end their relationship.

During cross-examination, the defense tried to impeach Bradford with prior testimony she gave during Mangum's first trial which was, in some respects, different from the testimony she gave in the second trial. For instance, while she previously testified that Mangum never broke up with her, in this trial she testified that "either" she "or" Mangum had broken up with the other in their prior break-ups. She had also been inconsistent about what she was wearing, mechanic work Mangum performed for her, and why she called her landlord. Even so, on re-direct, Bradford reiterated that she witnessed Mangum holding a gun on the day of the incident.

Officers also testified about Mangum's post-arrest conduct. Johnson, for instance, explained that he compiled over 200 phone calls made by Mangum while he was incarcerated at Pike County Jail. The government played several portions of those calls. Porter, who was not present at the trailer park on the day of the incident, explained that Mangum was brought into federal custody on

16                    Opinion of the Court                    24-11948

October 16, 2023.  Porter received Mangum's calls from November 2022 to November 2023.[4]  He investigated Mangum and Scott for witness tampering based on the Facebook messages Bradford showed him.  He directed Bradford to continue her conversation with Scott and ultimately obtained a search warrant for Scott's and Mangum's Facebook accounts to corroborate who the messages were from.  He also listened to calls Mangum made while incarcerated.  He confirmed the government's exhibit—the phone call summarized above—was a recording of a phone call from Mangum to Scott on October 16, 2023, and the government played the phone call for the jury.  Porter added that the phone number that Mangum called was the phone number associated with Scott's Facebook account.  Scott had sent the first Facebook message to Bradford the day after the phone call, and the other messages were sent shortly thereafter.  On cross-examination, Porter explained that no fingerprints were found on the firearm, he did not personally investigate Bradford's house after the incident, and he did not request DNA testing of the firearm.  Mangum stipulated that he had been convicted of a felony and that he knew he was a felon on the day of the incident.  The government rested.

Mangum moved for a judgment of acquittal, arguing that the government did not prove his guilt beyond a reasonable doubt. He argued the government presented no direct evidence of his possession of the firearm.  The government argued that it had made a

[4] Mangum maintained his objection to the line of questioning and admission of these messages.

prima facie case on each element and noted that Mangum stipulated to several elements.  It also explained that it had presented two witnesses who testified to seeing Mangum holding the firearm, circumstantial evidence of the firearm's retrieval near Mangum's cell phone, and Mangum's attempt to commit witness tampering.  The court denied Mangum's motion, finding there was sufficient evidence to sustain a conviction.  Mangum declined to testify.

In his defense, Mangum called Analyn Brogdon, the owner of the trailer park, who testified that the trailer park had surveillance cameras set up, but the footage was not requested in this case.  She also testified that she did not believe there was anything wrong with Bradford's back door when Bradford moved out.  Mangum also called his father, Larry Mangum, who testified that when he retrieved the black backpack from Mangum's car after his arrest, it contained mechanic's tools.  Mangum rested and the government did not offer any rebuttal witnesses.  Mangum renewed his motion for a judgment of acquittal, but the court again denied Mangum's motion.  The jury returned a verdict of guilty.  The district court later sentenced Mangum to 115 months' imprisonment, to be followed by three years of supervised release.  Mangum appealed.[5]

## II. STANDARDS OF REVIEW

We typically review the constitutionality of a statute *de novo*. *United States v. Pugh*, 90 F.4th 1318, 1324 (11th Cir.), *cert. denied*,

---

[5] On appeal, Mangum challenges only his conviction and does not raise any independent challenge to his actual sentence.

145 S. Ct. 236 (2024) (mem.); *United States v. Leahy*, 152 F.4th 1356, 1365 (11th Cir. 2025).  We review a district court's evidentiary ruling for abuse of discretion.  *United States v. Rivera*, 780 F.3d 1084, 1090 (11th Cir. 2015).  The abuse of discretion standard is deferential, as it "allows for a 'range of choice for the district court,' as long as that choice is not a 'clear error of judgment.'"  *United States v. Beaufils*, 160 F.4th 1147, 1163 (11th Cir. 2025) (quoting *Rasbury v. IRS* (*In re Rasbury*), 24 F.3d 159, 168 (11th Cir. 1994)).  A district court can abuse its discretion, however, by misapplying the law or by reaching a decision based on clearly erroneous findings of facts.  *Id.*; *see Stermer v. Old Republic Nat'l Title Ins. (In re ATIF, Inc.*), 160 F.4th 1124, 1137 (11th Cir. 2025) ("A trial court abuses its discretion if it misapplies the law, fails to follow required procedure, bases its decision on clearly erroneous facts, or clearly errs in judgment.").

We review sufficiency of the evidence *de novo,* viewing the evidence in the light most favorable to the government's case and drawing all reasonable inferences and making all credibility choices in favor of the jury's verdict.  *Robertson*, 493 F.3d at 1329.  "The relevant question in reviewing a sufficiency of the evidence claim is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  *United States v. Trujillo*, 146 F.3d 838, 845 (11th Cir. 1998) (emphasis in original) (quoting *United States v. Suba*, 132 F.3d 662, 671 (11th Cir. 1998)).  A jury is "free to choose among reasonable constructions of the evidence" and "[t]he government need not disprove every hypothesis of innocence . . . ."  *Suba*, 132 F.3d at 671–72.  The

test for sufficiency is the same whether the evidence presented is direct or circumstantial, but where the government relies on circumstantial evidence, reasonable inferences must support the conviction. *United States v. Martin*, 803 F.3d 581, 587 (11th Cir. 2015).

In undertaking our review, we are bound to follow our own prior binding precedent unless and until it is overruled by the Supreme Court or this Court sitting *en banc*. *See United States v. White*, 837 F.3d 1225, 1228 (11th Cir. 2016).

### III. ANALYSIS

As we noted at the outset, Mangum makes three arguments on appeal. We address, and reject, each in turn.

### A. Section 922(g)(1) is constitutional.

First, we are bound to reject Mangum's argument that 18 U.S.C. § 922(g)(1) is unconstitutional under the Second Amendment because our precedent forecloses this argument. *See United States v. Dubois*, 139 F.4th 887, 894 (11th Cir. 2025), *cert. denied*, No. 25-6281, 2026 WL 135685 (Jan. 20, 2026) (mem.).[6] In *Dubois*, we explained that neither *United States v. Rahimi*, 602 U.S. 680 (2024), nor *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), abrogated our decision in *United States v. Rozier*, 598 F.3d

---

[6] The government notes that Mangum failed to preserve this issue, so our review is only for plain error. *See United States v. Utsick*, 45 F.4th 1325, 1332 (11th Cir. 2022) (laying out the elements of plain-error review). Yet, Mangum's argument fails under any standard of review because our precedent squarely holds that § 922(g)(1) is constitutional. *See Dubois*, 139 F.4th at 894.

768 (11th Cir. 2010), which held that Section 922(g)(1) is constitutional under the Second Amendment. *Dubois*, 139 F.4th at 893–94; *see also Rozier*, 598 F.3d at 771 ("[S]tatutory restrictions of firearm possession, such as § 922(g)(1), are a constitutional avenue to restrict the Second Amendment right of certain classes of people. Rozier, by virtue of his felony conviction, falls within such a class."). As we said in *Dubois*, "[w]e require clearer instruction from the Supreme Court before we may reconsider the constitutionality of [S]ection 922(g)(1)." *Dubois*, 139 F.4th at 894. Until then, we are bound by our precedent to reject this argument and affirm. *White*, 837 F.3d at 1228.

### B. The District Court did not abuse its discretion in its evidentiary ruling.

Mangum next argues that the district court abused its discretion in admitting Scott's out-of-court statement to Bradford under Fed. R. Evid. 801(d)(2)(E). He argues that there was no evidence establishing a conspiracy between him and Scott; instead, the government "established only that: (1) on October 16, 2023, Mr. Mangum called Mr. Scott from the jail and asked if he had been in touch with Ms. Bradford; and (2) on October 20, 2023, Mr. Scott contacted Ms. Bradford through Facebook and asked her if she would accept cash not to come to court." He contends that this evidence was insufficient to establish a conspiracy and thus that the district court "misinterpreted the scope of Fed. R. Evid. 801(d)(2)(E), or failed to hold the government to its burden" of proof in establishing the conspiracy. The government argues that it presented sufficient evidence to establish a conspiracy, that

Mangum and Scott were involved, and that the admitted statements were made in furtherance of the conspiracy. It contends that the implication of Mangum's statements and Scott's behavior was "clear: Mangum did not want Bradford to come to court and testify against him, so he had his brother offer her a bribe not to come."

Under the Federal Rules of Evidence, hearsay is an out-of-court statement offered into evidence "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Generally, hearsay is not admissible. Fed. R. Evid. 802. However, a co-conspirator's out-of-court statement made during and in furtherance of the conspiracy is not hearsay and can be offered for the truth of the matter asserted. Fed. R. Evid. 801(d)(2)(E).

For evidence to be admissible through Rule 801(d)(2)(E), however, the government must first make a showing. *United States v. Miles*, 290 F.3d 1341, 1351 (11th Cir. 2002). It "must prove by a preponderance of the evidence: (1) that a conspiracy existed; (2) that the conspiracy included the declarant and the defendant against whom the statement is offered; and (3) that the statement was made during the course and in furtherance of the conspiracy." *Id.*; *see also Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Dickerson*, 248 F.3d 1036, 1049 (11th Cir. 2001); *United States v. Hough*, 803 F.3d 1181, 1193 (11th Cir. 2015) (same). When ruling on whether the government has made its showing, a court may look at information in the alleged co-conspirator's statement, "as well as independent external evidence." *Miles*, 290 F.3d at 1351; *United States v. Wenxia Man*, 891 F.3d 1253, 1271 (11th Cir. 2018).

In addition, the existence of a conspiracy may be proved by circumstantial evidence alone, *United States v. Knowles*, 66 F.3d 1146, 1155 (11th Cir. 1995), and a defendant need not be charged with the conspiracy for a co-conspirator's statement to be admissible, *United States v. Bowe*, 221 F.3d 1183, 1193 (11th Cir. 2000).

Here, we conclude that the district court did not abuse its discretion because it was reasonable to conclude the government made a sufficient showing under Fed. R. Evid. 801(d)(2)(E). *Miles*, 290 F.3d at 1351. The evidence presented showed Mangum called Scott on October 16 and directed him to contact Bradford, spelling out her name. The next day, Scott did so. In subsequent messages, Scott asked Bradford if she would take cash to not show up to Mangum's court date. This evidence was sufficient to establish the second element of the government's showing because the whole interaction contained both Scott and Mangum—"the declarant and the defendant." *Miles*, 290 F.3d at 1351.

Reasonable inferences from this circumstantial evidence are sufficient to show a conspiracy, satisfying the first element of the government's showing. *Knowles*, 66 F.3d at 1155; *cf. Martin*, 803 F.3d at 587 (noting the difference between reasonable inferences and mere speculation). "[T]he existence of a conspiracy may, and often is, be proved by circumstantial evidence." *Knowles*, 66 F.3d at 1155. The timing of the communications—and the lack of any other expressed reason for Mangum to ask Scott to contact Bradford—supported the district court's conclusion that the existence of the conspiracy was more likely than not. *See United States*

*v. Watkins*, 10 F.4th 1179, 1184 (11th Cir. 2021) (*en banc*) ("A preponderance of the evidence is evidence which is more convincing than the evidence offered in opposition to it."). In addition, the district court was permitted to consider "independent outside evidence," even hearsay evidence, *Wenxia Man*, 891 F.3d at 1271 (quoting *United States v. Byrom*, 910 F.2d 725, 735 (11th Cir. 1990)), such as Scott's later admission to Porter that Mangum asked him to contact Bradford and offer her money to not come to court.

Finally, the government needed to show "the statement was made during the course and in furtherance of the conspiracy." *Miles*, 290 F.3d at 1351. "[W]e apply a liberal standard in determining whether a statement is made in furtherance of a conspiracy." *Dickerson*, 248 F.3d at 1050 (citation omitted). Under that liberal standard, we conclude the district court did not err in this respect either. Because the district court did not err in concluding that a conspiracy existed, it also did not err in concluding that this communication—especially given the timing—was part of that conspiracy. *Dickerson*, 248 F.3d at 1050; *Santiago*, 837 F.2d at 1549.

For these reasons, we conclude that the district court acted within its "'range of choice" and did not commit "a 'clear error of judgment'" in determining that this evidence was admissible under Fed. R. 801(d)(2)(E). *Beaufils*, 160 F.4th at 1163 (quoting *Rasbury*, 24 F.3d at 168). Even where evidence is admissible, a district court retains discretion to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. However, the district court did not abuse

its discretion in this respect either. Rule 403 has a "strong presumption in favor of admissibility" and we must give the district court "deference" in its exercise of "discretion" in this respect. *United States v. Church*, 955 F.2d 688, 703 (11th Cir. 1992). Moreover, the evidence was very relevant; we have held that juries "may consider evidence of attempts to influence a witness as relevant in showing a consciousness of guilt." *United States v. Hammond*, 781 F.2d 1536, 1540 (11th Cir. 1986). Mangum does not identify any specific "unfair prejudice" on appeal, Fed. R. Evid. 403, and the relevance of this evidence is evident. Accordingly, we conclude the district court did not abuse its discretion in its evidentiary rulings.

### C. *The district court correctly denied Mangum's motion for judgment of acquittal because there was sufficient evidence to support his conviction.*

In his final challenge, Mangum argues that the district court erred in denying his motion for a judgment of acquittal because the government put forth insufficient evidence to prove he knowingly possessed the firearm. He argues that the evidence only established that the firearm was found in the bushes behind Bradford's house, and he emphasizes that there was no video or forensic evidence that he actually possessed the firearm. Instead, he states, the only evidence about his possession was Adams' and Bradford's testimony that they saw him possess the firearm, as well as the location of his cell phone next to the firearm. He contends this evidence was insufficient because Bradford provided inconsistent statements to law enforcement and it was possible, instead, that the firearm could have belonged to her because she had access to her

house and the cellphone and motive; she would have lost her housing if the firearm was hers.  He further asserts that the evidence at trial established only that he had a "toxic relationship" with Bradford, but not that he knowingly possessed a firearm.  The government argues that the evidence was sufficient, and that the district court correctly denied the motion for judgment of acquittal.  It contends video or forensic evidence was not required for a jury to sufficiently determine Mangum's guilt, especially where, as here, there was sufficient circumstantial evidence.

To convict a defendant for being a felon in possession of a firearm, the government must prove that: (1) the defendant was a convicted felon; (2) the defendant was in knowing possession of a firearm; and (3) the firearm was in or affected interstate commerce. 18 U.S.C. § 922(g)(1).  It also must prove "both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm." *Rehaif v. United States*, 588 U.S. 225, 237 (2019).  As it relates to the second element, possession of a firearm can be actual or constructive. *United States v. Ochoa*, 941 F.3d 1074, 1104–05 (11th Cir. 2019). To establish constructive possession, the government must offer evidence that the "defendant has ownership, dominion, or control over an object or the premises where the object is found." *United States v. Flanders*, 752 F.3d 1317, 1332 (11th Cir. 2014).  Yet, "a defendant's mere presence in the area of [an object] or awareness of its location is not sufficient to establish possession." *United States v. Green*, 873 F.3d 846, 852–53 (11th Cir. 2017) (alteration in original) (quoting *United States v. Beckles*, 565 F.3d 832, 841 (11th Cir. 2009)).

Here, sufficient evidence supported Mangum's conviction. Mangum stipulated to having been convicted of a felony and to knowing as much, *Rehaif*, 588 U.S. at 237, and does not argue that there was insufficient evidence that the firearm in question was in or affected interstate commerce, 18 U.S.C. § 922(g)(1). Accordingly, the only question is whether there was sufficient evidence that Mangum possessed the firearm. Taking the evidence in the light most favorable to the jury's verdict, we conclude there was. *Robertson*, 493 F.3d at 1329.

First, to the extent that Mangum argues that Bradford was not credible, he has not shown reversible error. Credibility determinations are the "'exclusive province' of the jury." *United States v. Hano*, 922 F.3d 1272, 1289 (11th Cir. 2019) (quoting *United States v. Feliciano*, 761 F.3d 1202, 1206 (11th Cir. 2014)). We assume that the jury made credibility determinations in a manner that supports the verdict it issued. *Robertson*, 493 F.3d at 1329; *United States v. Lebowitz*, 676 F.3d 1000, 1013–14 (11th Cir. 2012). A jury is free to believe or disbelieve a witness' testimony in whole or in part. *United States v. Williams*, 390 F.3d 1319, 1325–26 (11th Cir. 2004). We defer to a credibility determination by a factfinder "unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it." *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) (quoting *United States v. Eddy*, 8 F.3d 577, 580 (7th Cir. 1993)). Here, Mangum successfully put Bradford's credibility at issue at trial—probing inconsistent statements she made and her behavior during the incident—but the jury was not persuaded and believed

Bradford's testimony. *Williams*, 390 F.3d at 1325–26. Moreover, her testimony was not so inconsistent or improbable that no reasonable factfinder could accept it. *See Ramirez-Chilel*, 289 F.3d at 749. In fact, her testimony that she saw Mangum possess the gun was corroborated by Adams' testimony, which was largely unimpeached.

To the extent that Mangum contends the evidence was insufficient because the government failed to produce video or forensic evidence showing that he possessed the firearm, such evidence is not required. *See Martin*, 803 F.3d at 587. Instead, circumstantial evidence, supported by reasonable inferences—as is present here—is sufficient to establish possession. *See id.* In addition, while Mangum's trial strategy focused on the government's evidence preservation at trial, such issues "generally go to the weight rather than the admissibility of evidence" and the jury was permitted to give the government's evidence weight notwithstanding any gaps in the evidence that Mangum identified. *United States v. Varazo*, 118 F.4th 1346, 1354 (11th Cir. 2024). Indeed, the relevant evidence—such as the gun—could be reasonably tied to Mangum because of "the circumstances surrounding its discovery." *Id.* (quoting *United States v. Williams*, 865 F.3d 132, 1343 (11th Cir. 2017)).

At bottom, there was sufficient evidence for the jury's verdict, and the district court did not err in denying Mangum's motion for acquittal. The government provided testimony from Adams and Bradford, who each testified that they saw Mangum holding a firearm and that the firearm the government found was the one he

was holding. This was evidence which the jury could have credited and concluded showed, in fact, that Mangum had possessed that firearm. *See Trujillo*, 146 F.3d at 845; *Suba*, 132 F.3d at 671–72. The government also provided testimony that tended to suggest that the back door of Bradford's house had been tampered with and potentially opened. From this, a rational jury could reasonably conclude that Mangum took the gun into the backyard and hid it there. *Trujillo*, 146 F.3d at 845; *Martin*, 803 F.3d at 587. Moreover, the footage played, and the testimony of law enforcement officers, showed that there was a cell phone recovered in the back yard near the gun and Mangum identified the phone as his own.

Accordingly, we decline to disturb the jury's verdict and affirm on this issue as well. For the reasons we have explained, we reject each of Mangum's arguments on appeal and affirm.

**AFFIRMED.**